IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| TANIA CHARLES-WRIGHT AND SSG ROBERT WRIGHT, JR., INDIVIDUALLY AND ON BEHALF OF R.W., A MINOR CHILD, | § § § § § § | |
| PLAINTIFFS | § | |
| vs. | § § | NO. _____ |
| UNITED STATES OF AMERICA, | § § § | |
| DEFENDANT | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Tania Charles-Wright and SSG Robert Wright, Jr., individually and on behalf of R.W., a Minor Child, bring this complaint under the Federal Tort Claims Act, 28 U.S.C. § 2674. Plaintiffs complain of the United States of America and would respectfully show the following:

## I. PARTIES

**1.1.** This is a medical malpractice case.

**1.2.** Plaintiffs Tania Charles-Wright and R.W. live in Savannah, Georgia. SSG Robert Wright, Jr., lives in Prince George, Virginia. Tania Charles-Wright and SSG Robert Wright, Jr., are the natural and biological parents of R.W.

**1.3.** The Defendant is the United States of America, its officers, agents, employees, and representatives.

## II. JURISDICTION, SERVICE, AND VENUE

**2.1.** This Federal District Court has jurisdiction because this action is brought pursuant to and in compliance with 28 U.S.C. §§ 1346(b), 2671–80, commonly known as the Federal Tort Claims Act, which vests exclusive subject-matter jurisdiction of the Federal Tort Claims Act in Federal District Court.

**2.2.** The United States of America may be served with process in accordance with Rule 4(i) of the Federal Rules of Civil Procedure by serving a copy of the Summons and Complaint on United States Attorney Edward J. Tarver, United States Attorney for the Southern District of Georgia by certified mail, return receipt requested at his office:

> U.S. Attorney's Office Southern District of Georgia
> 22 Barnard Street, Suite 300
> Attn: Civil Process Clerk
> Savannah, Georgia 31401

**2.3.** Service is also affected by serving a copy of the Summons and Complaint on Jeff Sessions, Attorney General of the United States, by certified mail, return receipt requested at:

> The Attorney General's Office
> ATTN: Civil Process Clerk
> U.S. Department of Justice
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530-0001

**2.4.**    Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1)(B) because the United States is a Defendant and a substantial part of the events or omissions giving rise to the claim occurred within this judicial district.

### III. LIABILITY OF THE UNITED STATES

**3.1.**    This case is commenced and prosecuted against the United States of America in compliance with Title 28 U.S.C. §§ 2671–80, the Federal Tort Claims Act. Liability of the United States is predicated specifically on 28 U.S.C. § 2674 because the personal injuries, wrongful death, and resulting damages for which the complaint is made were proximately caused by the negligence, wrongful acts, and/or omissions of employees and/or agents of the United States of America working at the Winn Army Community Hospital in Fort Stewart, Georgia, while acting within the scope of their office, employment, and/or agency under circumstances where the United States of America, if a private person, would be liable to the Plaintiffs in the same manner and to the same extent as a private individual.

**3.2.**    The substantive law of the State of Georgia applies to this lawsuit.

**3.3.**    The Department of the Army is an agency of the United States of America.

**3.4.**    The Defendant United States of America, through its Department of the Army, at all material times owned, operated, and controlled the Winn Army Community Hospital in Fort Stewart, Georgia, and staffed its facilities with its agents, servants, and employees.

3

**3.5.**   At all material times all persons involved in the medical and health care services provided to Tania Charles-Wright and R.W. at the Winn Army Community Hospital (WACH), Fort Stewart, Georgia were agents, servants, and/or employees of the Department of the Army, the United States of America, or some agency thereof, and were at all material times acting within the course and scope of such employment.

## IV. JURISDICTIONAL PREREQUISITES

**4.1.**   Plaintiffs plead pursuant to 28 U.S.C. §§ 2672 and 2675(a) that the claims set forth meet all jurisdictional prerequisites, including timely administrative presentment. The claims set forth in this complaint were delivered to the Department of the Army on December 27, 2012. Receipt of the claims was acknowledged by the Department of the Army on January 8, 2013. Greater than six months have passed since the filing of these claims, and the United States Army has failed to resolve the claims. The claims are deemed denied. Accordingly, pursuant to 28 U.S.C. § 2675(a), Plaintiffs have complied with all jurisdictional prerequisites and conditions prior to the commencement and prosecution of this suit.

**4.2.**   Plaintiffs' Form 95s administratively presented to the United States on behalf of Tania Charles-Wright and SSG Robert Wright, individually and on behalf of R.W., each stated a "sum certain" of forty million dollars ($40,000,000.00).

## V. FACTS

**5.1.**   This is a Federal Tort Claim Action for monetary damages sustained by Plaintiffs arising out of the personal injuries to Tania Charles-Wright and her child, R.W., as a result of substandard—and therefore negligent—medical and hospital care, including but not limited to: failure to properly and safely monitor for uterine hyperactivity; failure to identify signs of uterine hyperstimulation; failure to timely intervene following administration of Cytotec and Pitocin for induction of labor; failure to properly administer and regulate Pitocin; failure to properly assess, recognize and timely intervene for fetal distress; failure to timely order a caesarean delivery; and failure to properly use operative vaginal devices, including vacuum extractor and forceps. All of these failures individually and collectively proximately caused hypoxic-ischemic brain injury to R.W., and uterine rupture resulting in injury to Tania Wright, including loss of a functional uterus and right ureter injury requiring additional surgeries.

**5.2.**   Tania Charles-Wright was 24 years old during her pregnancy with R.W., a girl. This was Tania Charles-Wright's fourth pregnancy. Before R.W.'s delivery, Tania Charles-Wright's pregnancy had been uneventful and progressing without complication. The medical records, ultrasounds, and biophysical profile showed that R.W. was developing normally in utero and was otherwise healthy.

**5.3.**   Tania Charles-Wright presented to WACH at approximately 10:00 a.m. on March 11, 2012, for induction of labor. She was 41 weeks, 1 day gestation. R.W. was normal and healthy upon arrival, as evidenced by a normal baseline fetal heart rate of

150 beats/minute with good variability, adequate blood flow and oxygen to the fetus, and a normal ultrasound.

5.4.    At approximately 12:05, Dr. Rivera vaginally administered 50mcg Cytotec to Tania Charles-Wright to thin her cervix. Cytotec carries a known risk of uterine hyperstimulation that can cause uterine rupture.

5.5.    After administering Cytotec, Winn ACH health care providers failed to recognize signs of hyperstimulation and failed to intervene appropriately. Treatment of the uterine hyperstimulation—such as administration of terbutaline, which has been shown to effectively stop tachysystole—more likely than not would have prevented the uterine rupture. However, because the hyperstimulation was not recognized, it went undiagnosed and untreated until the uterus ruptured, leading to disastrous consequences.

5.6.    Pitocin 2mu was started at 17:02 even though Ms. Wright's contractions were only 1.5-2 minutes apart and at least 40 seconds in duration. Pitocin is another drug that carries the known risk of uterine hyperstimulation and thus, uterine rupture. Combining Cytotec with Pitocin should have put the healthcare providers on alert for possible uterine hyperstimulation, especially in light of her objection signs of it. By 17:22, the fetal monitoring strips (FMS) showed uterine contractions occurring too close together and lasting too long to be safe for R.W. or Tania Charles-Wright. At this point, uterine hyperstimulation (contractions lasting longer than 2 minutes, 5 or more contractions in 10 minutes over a 30 minute period, or contractions of normal duration occurring within 60 seconds of each other) and tachysystole (six or more contractions occurring every 10

6

minutes for consecutive 10-minute periods) were evident. Despite evidence of uterine hyperstimulation and tachysystole, the Pitocin was increased to 4mu at 17:28.

5.7.    Errors relating to the use of Pitocin are often not dose-related but involve failure to timely recognize and treat excessive uterine activity in response to the drug—regardless of the dose used. Uterine hyperstimulation and tachysystole prevent adequate time between contractions to maximally perfuse the placenta and transport oxygen to the fetus, and there is a significant risk of fetal hypoxemia and acidemia if contractions are too frequent and/or prolonged. These conditions also pose dangers to the mother, including risk of uterine rupture, postpartum hemorrhage and infection. Despite these risks and objective evidence of uterine hyperstimulation and tachysystole, the healthcare providers increased the Pitocin to 6mu at 18:26. By 19:08, Ms. Wright's contractions were lasting 70-80 seconds with minimal relaxation between them. Moreover, the medical records included an order to discontinue Pitocin if hyperstimulation or a non-reassuring fetal heart rate pattern occurred. This order was ignored.

5.8.    At approximately 20:08, the fetal heart rate crashed and dropped to 70. Pitocin was finally turned off at this time, though it was too late. At 20:10, Tania Charles-Wright was complete with cervix 10 cm dilated, 100% effaced, and station O, and pushing was initiated. Then the fetal heart rate dropped so low it stopped recording on the monitor. At 20:12, a fetal scalp electrode was placed but the fetal heart rate was still inaudible and the electrode was discontinued. Still, a cesarean section was not called. At 20:16, an external ultrasound was applied and at 20:18 the fetal heart rate was documented as "audible in the 50s." Still no cesarean section called. At 20:19, a vacuum

was applied with a pop-off meaning that it would not affix. According to the records, the vacuum extractor popped off twice. This was likely due to the fact that a vacuum extractor should never have been attempted in the first place. The baby's head was too high for an extractor. Plus, the mother should have been sent to an OR well before this time where prep for c-section should have been taking place. But at this time, a nurse continued to use the ultrasound to search for a fetal heart rate, which was documented at 20:23 to have been "audible in the 60s." Still no cesarean section was called. Remarkably, forceps were applied (unsuccessfully) at 20:25 and 20:26, and the fetal heart rate was again noted as "audible in the 60s" at 20:27. Finally at 20:29—after 21 minutes of significant fetal bradycardia and distress—a cesarean section was called.

5.9.    Plaintiff SSG Robert Wright reported seeing gushing blood from his wife's vagina when she began to push. It is more likely than not that when the fetal heart rate plummeted at 20:08 and was lost on the monitor, Tania Charles-Wright's uterus was rupturing. A prudent physician would not have spent over 20 minutes having Tania Charles-Wright attempt to push the baby out when it was immediately clear that the pushing was ineffective and the uterus had ruptured due to uterine hyperstimulation from the Cytotec and Pitocin.

5.10.    R.W. was delivered via emergency C-section by Dr. Kachroo at 20:38. The operative note listed complications of fetal decelerations, uterine rupture, and vacuum to extract. The post-op diagnosis was uterine rupture of the right broad ligament with an estimated blood loss of 1100ml. Following the surgery, Tania Charles-Wright continued to bleed internally and developed decreased urine output. She was taken back for

8

emergency surgery due to internal hemorrhaging and right ureter blockage. At that point, Tania Charles-Wright underwent a supracervical hysterectomy, losing all opportunity to conceive another child. It was also discovered that during the initial C-section, Dr. Kachroo had sutured Tania Charles-Wright's right ureter closed, causing right hydronephrosis, or swelling of the right kidney due to obstructed urine flow. As a result, she also had to undergo ureter-ureteral anastomosis and have a stent placed.

5.11.     The aftermath from the uterine rupture continued when Tania Charles-Wright was later transferred to Memorial University Medical Center to be with R.W. There, she developed a subcutaneous tissue dehiscence requiring another exploratory surgery and wound vac.

5.12.     R.W. was born limp, bradycardic, cyanotic, and had no respiratory effort. Her Apgar score at 1 minute was documented as 3, with no points for tone (limp), reflex (no response), and color (pale/blue); 1 point for HR (<100); and 2 points for respiratory status indicating "good cry." The notion that R.W. had a "good cry" is curious because she had no respiratory effort and was immediately intubated. Thus, R.W.'s initial 1-minute Apgar score was more accurately a 1. At 5 minutes, her Apgar score was documented as 6, once again with a score of 2 for respiratory status, even though she remained intubated.

5.13.     Within a few hours of her birth, R.W. was transferred to Memorial University Medical Center NICU with diagnoses of newborn respiratory failure and metabolic acidosis. Later, her discharge summary from Memorial University Medical Center listed her diagnosis as Hypoxic-Ischemic Encephalopathy (HIE). The note stated she had

developed "quivering movements of the jaw and lower extremities," diagnosed as seizure activity. The note further stated, "ABG at 1 hour was pH 6.99, PCO2 22, BD (base deficit) -27 . . . On arrival to NICU, child's exam compatible with modified Sarnat 2. Met criteria to start body cooling at approximately 5 hours of life."

5.14.    The Sarnat Grading Scale is a classification scale for HIE. A Sarnat score of 2 indicates moderate HIE, characterized by lethargy, reduced tone of the extremities and/or trunk, diminished brainstem reflexes (pupil/gag/suck) and possible clinical seizures. A Cooling-Cap System can be initiated during the first 6 hours of a hypoxic injury to try to mitigate cell death, and R.W. qualified for and received such treatment. R.W. also underwent physical therapy following her discharge and is being followed by neurology.

5.15.    U.S. Government health care providers failed to respond appropriately when the fetal monitoring strips showed uterine hyperstimulation with tachysystole for over 3 hours, as evidenced by contractions occurring one after another starting at 17:22. It is a known fact that uterine hyperstimulation without appropriate intervention leads to rupture of the uterus, a risk that was significantly increased by the administration of Cytotec. Therefore, the Winn ACH health care providers should have been extremely vigilant and responded immediately to the dangerously abnormal contraction pattern.

5.16.    In addition, Pitocin was administered and its dosage increased twice while uterine hyperstimulation was occurring. Eventually, after repeated insults to the uterus over a 3-hour period, the uterus ruptured, with subsequent complications resulting in neurological injury to R.W. and injury to Tania Charles-Wright. Furthermore, Winn ACH

health care providers continued to attempt an operative vaginal delivery after it was evident that Tania Charles-Wright was hemorrhaging and the baby was suffering from oxygen deprivation and fetal distress. A C-Section should have been attempted earlier, which also would have spared R.W. the trauma of forceps, vacuum extractor, and prolonged hyperstimulation, as well as prevented Tania Charles-Wright's uterus from rupturing. The full extent of the injuries to both Tania Charles-Wright and R.W. are not known at this time.

## VI. CAUSE OF ACTION

**6.1.**    The Defendant, the United States of America, was negligent in one or more of the following respects:

1.    In failing to timely and properly monitor Tania Charles-Wright and R.W.;

2.    In failing to timely and properly care for Tania Charles-Wright and R.W.;

3.    In failing to timely and properly assess Tania Charles-Wright and R.W.'s medical needs;

4.    In failing to timely and properly diagnose Tania Charles-Wright and R.W.;

5.    In failing to timely and properly treat Tania Charles-Wright and R.W.;

6.    In failing to properly and safely monitor for uterine hyperactivity;

7.    By administering Cytotec for induction of labor;

8.    In failing to obtain appropriate informed consent from Tania Charles-Wright to administer Cytotec for induction of labor;

9.    In failing to properly and safely administer Pitocin;

11

10.    In failing to identify signs of uterine hyperstimulation and timely intervene to prevent injury to Tania Charles-Wright and/or R.W.;

11.    In failing to diagnose and treat uterine hyperstimulation and tachysystole;

12.    In failing to timely and properly respond to signs of significant fetal bradycardia and distress;

13.    In failing to properly administer and regulate Pitocin;

14.    In failing to safely apply the vacuum extractor and forceps;

15.    In failing to time recognize fetal distress and intervene appropriately; and

16.    In failing to timely order a cesarean section.

6.2.    At all material times, the employees, agents, or representatives of the United States of America were negligent and proximately caused the injuries sustained by the Plaintiffs.

## VII. DAMAGES

7.1.    As a proximate result of the Defendant's negligent acts or omissions, R.W. has sustained damages and injuries including, but not limited to:

1.    Past and future physical pain and suffering;

2.    Past and future mental anguish and mental pain and suffering;

3.    Past and future medical, health care and attendant care expenses;

4.    Loss of earnings and earning capacity;

5.    Loss of consortium with her parents, Tania Charles-Wright and Robert Wright;

6.     Past and future mental impairment;

7.     Past and future physical impairment;

8.     Past and future physical disfigurement;

9.     Loss of years of life expectancy; and

10.    Other pecuniary damages.

7.2.     Tania Charles-Wright, individually, as the mother of R.W., has incurred damages including, but not limited to, the following:

1.     Past and future physical pain and suffering;

2.     Past and future mental anguish and mental pain and suffering;

3.     Past and future medical, health care and attendant care expenses;

4.     Loss of consortium with her daughter, R.W.;

5.     Past and future physical impairment;

6.     Past and future physical disfigurement;

7.     Loss of earnings and earning capacity;

8.     Child care expenses;

9.     Out of pocket expenses; and

10.    Other pecuniary damages.

7.3.     As the husband of Tania Charles-Wright and the father of R.W., Robert Wright, individually, has incurred damages including, but not limited to:

1.     Past and future mental anguish and mental pain and suffering;

2.     Past and future medical, health care, and attendant care expenses;

3.     Loss of consortium with his daughter, R.W.;

13

4.      Loss of earnings;

5.      Child care expenses; and

6.      Other pecuniary damages.

**7.4.**    In addition, Plaintiffs SSG Robert Wright and Tania Charles-Wright, individually and on behalf of R.W., seek recovery of all other damages to which they are entitled pursuant to the applicable state and federal law(s).


## VIII. COMPLIANCE WITH GA. CODE ANN. §9-11-9.1

**8.1.**    Plaintiffs do not believe that O.C.G.A § 9-11-9.1 applies in this case. In the unlikely event it is determined that O.C.G.A. § 9-11-9.1 applies, Plaintiffs attach as "Exhibit A" an affidavit from an expert competent to testify which sets forth specifically at least one negligent act or omission committed by Defendant along with the factual bases for it.


## CONCLUSION

Plaintiffs request that Defendant be cited to appear and answer herein: that upon final trial and hearing, the Plaintiffs have a judgment against the Defendant for the amount of actual damages; and for such other and different amounts as they shall show by proper amendment before trial; for post-judgment interest at the applicable legal rate; for all Court costs incurred in this litigation; and for such other and further relief, at law

and in equity, both general and special, to which the Plaintiffs may show themselves entitled to and to which the Court finds them deserving.

Respectfully Submitted,

Jeffrey W. Lasky
Georgia State Bar No. 438525
Lasky Cooper Law
120 W. Liberty St.
P.O. Box 9086
Savannah, Ga. 31401
T- 912-232-6423
F- 912-234-1818
jlasky@laskycooperlaw.com

JAMAL K. ALSAFFAR, *pro hac vice pending*
Texas State Bar Number:  24027193
KOBY KIRKLAND, *pro hac vice pending*
Texas State Bar Number: 24086587
For Whitehurst, Harkness, Brees, Cheng, Alsaffar, & Higginbotham, PLLC
7500 Rialto Blvd., Bldg. Two, Ste. 250
Austin, Texas 78735

Attorneys for the Plaintiffs

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| TANIA CHARLES-WRIGHT AND SSG ROBERT WRIGHT, Jr., individually and on behalf of R.W., A MINOR CHILD, | § § § § | |
| Plaintiffs | § § | |
| VS. | § § | No. _____ |
| United States of America, | § § | |
| Defendant | § § § | |

### AFFIDAVIT OF AARON CAUGHEY, M.D.

| | |
|---|---|
| STATE OF PORTLAND | § |
| | § |
| COUNTY OF MULTNOMAH | § |

Aaron Caughey, M.D., being duly sworn, deposes and states:

1.   At present, I am Professor and Chair of the Department of Obstetrics & Gynecology at Oregon Health & Science University. I earned my medical degree from Harvard Medical School in 1995 as well as a Master's in Public Policy with a focus in Health Care Policy from the Kennedy School of Government in 1995. I completed a residency in Obstetrics and Gynecology at the Brigham and Women's Hospital and Massachusetts General Hospital combined residency program in 1999. I completed my Maternal-Fetal Medicine Fellowship training in 2002 at UCSF, earning a Master's degree in Public Health in 2001. Subsequently, I completed my doctorate in Health Economics at the University of California, Berkeley. I received my Board Certification in Obstetrics & Gynecology in 2004 and in Maternal-Fetal Medicine in 2007 and have been practicing as an attending physician in obstetrics and gynecology for sixteen years. In addition to practicing in teaching hospitals, I have also practiced in several community hospitals and served as a consultant to a variety of private practitioners in a wide range of practice settings and have an understanding of the practice standards of obstetricians, family practice physicians, certified nurse

1

midwives, and labor and delivery nurses.

2.  By education, training and experience, I am qualified to provide an opinion relating to the standard of care required and the breaches of it for the treatment, management, and delivery of R.W. and her mother Ms. Wright's labor and delivery course.

3.  I have reviewed the medical records of Mrs. Charles-Wright and her child R.W. that were forwarded me. The opinions expressed below are based on the records that I have reviewed thus far. I have reached these opinions to a reasonable degree of medical probability, based on my experience, education and training.

4.  The relevant facts are as follows:

On March 11, 2012 at approximately 10:00, Mrs. Charles-Wright presented to Winn ACH for induction of labor because she was late term, at 41 weeks, 1 day gestation. This was her third baby and there were no problems with the previous two deliveries. At admission, the fetal heart rate (FHR) monitor showed a normal baseline fetal heart rate of 150 beats/minute with moderate variability. Her NST (non-stress test) was reactive, indicating that the fetus was adequately oxygenated without acidemia at that time. An ultrasound was performed and reported as normal.

At approximately 12:05, 50mcg misoprostol (Cytotec), a synthetic prostaglandin, was administered vaginally to ripen (soften and thin) the cervix. By 15:53, the tocometer demonstrated uterine contractions occurring too close together (this is termed tachysystole). Tachysystole, which is defined as more than five contractions occurring every 10 minutes for consecutive 10-minute periods, was evident for hours, until 20:09.

Despite the contractions coming too close together, an oxytocin infusion was begun and increased during this time period, from 2mu/min at 17:02 to 4mu/min at 17:28, even though contractions were only 1 minute to 1.5 minutes apart. By 17:40, the tachysystole had increased with at least 6 contractions in 8 minutes lasting 40-50 seconds. Despite an order to discontinue oxytocin with hyperstimulation or a non-reassuring FHR pattern, the oxytocin was increased to 6mu/min at 18:26. Contractions continued to be 1-2 minutes apart, lasting 40-50 seconds. By 19:05, contractions were 70-80 seconds long with minimal relaxation between them.

At approximately 20:08, the fetal heart rate significantly dropped to 70. At 20:10, the oxytocin was finally discontinued when Mrs. Charles-Wright was fully dilated and effaced, 0 station, and pushing was initiated. The fetal heart rate was so low it was not recorded on the fetal monitor.

A fetal scalp electrode (FSE) was placed at 20:12 and the fetal heart rate was still not audible; the FSE was discontinued at 20:12. An external ultrasound (us) was applied at 20:16 in an attempt to find the fetal heart rate. The note from 20:17 stated, "RN searching for fhr via us monitor." At 20:18, the fetal heart rate was "audible

2

in 50s."

At 20:19, a vacuum extractor was applied with an immediate pop-off. At 20:22 the record stated, "RN continues searching for FHR via us monitor. 20:23 FHR audible in 60s."

At 20:23, the nurse locates the FHR in the 60's. Such a low fetal heart rate is important clinically, because the fetal brain cannot be adequately perfused at this heart rate.

At 20:25, Dr. Kachroo applied forceps and at 20:26 the following was recorded, "RN continues searching for fhr via us monitor. 20:27 fhr audible in 60s."

At 20:27, the FHR was still in the 60's at the time of the forceps application. At that time, Dr. Kachroo's note indicates that Mrs. Charles-Wright was complaining of upper abdominal pain at the time of the forceps application and thought there might be a uterine rupture. At that time, a cesarean delivery was called for due to "suspicion of uterine rupture and persistent fetal bradycardia." However nursing notes document that a vacuum was applied a second time at 20:27 and a "vacuum pop-off" at 20:28, after the forceps application.

At 20:29, after 21 minutes of significant fetal bradycardia and distress, a cesarean delivery was called for certain. More likely than not, when the fetal heart rate drastically dropped at 20:08 and was lost on the fetal heart rate monitor, the uterus was rupturing.

R.W. was delivered via emergency cesarean by Dr. Kachroo at 20:38, nine minutes after the cesarean delivery was called. The operative note listed complications of delivery to include fetal decelerations, uterine rupture, and failed vacuum extraction. The post-op diagnosis was uterine rupture into the right broad ligament with an estimated blood loss 1100 ml.

Following the surgery, Mrs. Charles-Wright continued to bleed internally with her hemoglobin dropping dangerously low to 5.7 and HCT 16.5 and developed decreased urine output. She was taken back for emergency surgery due to the suspicion of internal hemorrhaging as well as right ureter blockage.

At that point, Mrs. Charles-Wright underwent supracervical hysterectomy losing all opportunity to conceive another child and it was discovered that Dr. Kachroo had sutured her right ureter closed during the initial surgery. Her right ureter was found to be stitched closed by 2 sutures causing right hydronephrosis, swelling of the right kidney due to urine flow being obstructed. She had to undergo uretero- uretero anastomosis and have a stent placed. Mrs. Charles-Wright continued to suffer from the aftermath of the ruptured uterus when she was transferred to Memorial University Medical Center to be with her daughter. She developed a subcutaneous tissue dehiscence requiring another exploratory surgery and wound vac.

3

When R.W. was born, she was limp and cyanotic with no respiratory effort and bradycardic. Her Apgar scores were documented as 3 at 1 min with no points for the following, tone (limp), reflex (no response) and color (pale/blue), 1 point for HR (<100) and 2 points for respiratory status which indicated "good cry." (Neonatal Admission Note 3/11/2012.) But R.W. did not have a good cry as she had no respiratory effort and was immediately intubated. Her initial 1 min Apgar score was likely more accurately 1. At 5 min, her Apgar score was documented as 6, again 2 for respiration, although she remained intubated.

Within a few hours of her birth, R.W. was transferred to Memorial University Medical Center NICU with the diagnoses of respiratory failure of the newborn and metabolic acidosis. The discharge summary from Memorial University Medical Center listed her diagnosis as Hypoxic-Ischemic Encephalopathy (HIE). The note stated that she developed "quivering movements of the jaw and lower extremities" diagnosed as seizure activity. The note also stated, "ABG at 1 hour was pH 6.99, PCO2 22, BD (base deficit) - 27…On arrival to NICU, child's exam compatible with modified Sarnat 2. Met criteria to start body cooling at approximately 5 hours of life." (Discharge Summary, 3/30/12.)

The Sarnat 2 criteria is defined as moderate HIE and includes lethargy, reduced tone of the extremities and/or trunk, diminished brainstem reflexes (pupil/gag/suck) and possible clinical seizures. Body cooling can be initiated during the first 6 hours of a hypoxic injury in an attempt to minimize injury from HIE. It was determined that R.W. met the above criteria and hypothermic treatment was initiated.

5.   Based on my review of the medical records and my knowledge and experience in treating similarly situated patients, I have identified the following standard of care violations committed by the healthcare providers at Winn Army Community Hospital, Fort Stewart, Georgia. All of the following conclusions regarding the standard of care applicable to Mrs. Charles-Wright and R.W.'s care are based on a reasonable degree of medical certainty.

   a.   *Misoprostol dosing* - The decision to dose Mrs. Charles-Wright with 50 micrograms of vaginal misoprostol was questionable. Of note, while misoprostol is commonly utilized for labor induction, it is not currently FDA approved. While historically, the 50 microgram vaginal dose had been utilized, multiple studies have demonstrated that the rate of tachysystole is higher with this dosing regimen and a 25 microgram vaginal dose is the most common initial dose utilized at most institutions. It is usual practice to begin with a 25-microgram dose vaginally and then if there is minimal response to this dose, to increase to a 50-microgram dose at that time. Further, because Mrs. Charles-Wright was multiparous, the need for a higher dose of misoprostol was not called for, as inductions in multiparous women are easier to initiate and accomplish.

4

b. ***Identification and management of tachysystole*** - Failing to recognize and respond to tachysystole was a breach of the standard of care. The standard of care requires clinicians to monitor the fetal heart rate and uterine contractions as closely as possible in the setting of continuous fetal heart rate monitoring. If misoprostol is used during labor, the standard of care requires the labor nurse and physician to be vigilant in monitoring for any signs of uterine tachysystole. Tachysystole is more than 5 uterine contractions in a 10-minute period. The Winn ACH health care providers failed to recognize uterine tachysystole and failed to manage labor appropriately.

First, Mrs. Charles-Wright had tachysystole that began at approximately 15:53. This persisted over the next hour, but despite this, the clinicians began oxytocin augmentation at 17:02. Oxytocin should be decreased or discontinued if the number of contractions persists with a frequency greater than five in a 10-minute period, not begun or increased. Discontinuation of oxytocin nearly always rapidly decreases the frequency of contractions. (Cunningham G, et al. Williams Obstetrics. 2005, pg. 540). Despite the tachysystole, the oxytocin was started and then increased, from 2mu at 1702 to 4mu at 17:28. The oxytocin was further increased to 6mu at 18:26 despite evidence of persistent uterine tachysystole. Increasing the oxytocin despite the ongoing tachysystole was a clear violation of the standard of care.

In 2007, the Institute for Safe Medication Practices added IV oxytocin (Pitocin) to their list of high-alert medications. High-alert means the medication has "a heightened risk of causing significant patient harm" when used in error. (Kathleen Simpson, PhD and Eric Knox, MD *Oxytocin as a High-Alert medication: Implications for Perinatal Patient Safety*, MCN, The American Journal of Maternal/Child Nursing Jan/Feb 2009, Vol 34. No 1, 8-15.) "Errors that involve IV oxytocin administration for labor induction or augmentation are most commonly dose related and often involve lack of timely recognition and appropriate treatment of excessive uterine activity (tachysystole)." *Id.* Excessive uterine activity prevents adequate time between contractions "required to maximally perfuse the placenta and transport oxygen to the fetus." *Id.*

The implications of tachysystole on the fetus are well documented. "There is a risk of fetal hypoxemia and acidemia if contractions are too frequent and/or prolonged. Within 5 min of excessive uterine activity, fetal oxygen desaturation begins, progressively decreasing 20% to 29% over a 30- minute period until normal uterine activity is restored. One hour of excessive uterine activity during the first stage of labor or over the course of second stage labor is associated with a significantly increased risk of neonatal academia. When fetal oxygenation is sufficiently impaired to produce metabolic acidosis from anaerobic glycolysis, direct myocardial depression occurs." *Id.* Additionally, uterine tachysystole is associated with significant "adverse maternal events to include uterine rupture, postpartum hemorrhage and infection." *Id.*

5

More likely than not, had the tachysystole not persisted and increased with the use of oxytocin the uterine rupture would not have occurred. However, because the tachysystole was not recognized, it went undiagnosed and untreated until the uterus ruptured leading to disastrous consequences for both mother and baby.

c. **Fetal heart rate interpretation** - Failing to properly interpret the fetal heart rate monitoring strip was a breach of the standard of care. The standard of care requires that in the setting of continuous fetal heart rate monitoring that a clinician properly interpret the fetal heart rate strip. If the fetal heart tracing is lost, it is the provider's responsibility to ensure the monitor regains the HR signal and interpret the patterns correctly. At times, the fetal heart tracing was lost altogether and it is unclear that the providers recognized the severity and importance of the fetal bradycardia that began at 20:08.

d. **Timing of delivery.** The providers allowed 21 minutes of significant and prolonged fetal bradycardia to transpire before a cesarean delivery was called. A prudent physician would not have spent more than 5 minutes, let alone 20 minutes, attempting to have Mrs. Charles-Wright push the baby out or spent an inordinate amount of time on a mid-pelvic operative vaginal delivery in this setting. This is because in the setting of a bradycardia, fetal injury will occur, more likely than not, beyond 18 minutes, so timing of delivery is important to manage properly in this setting. There should have been concern that given the prolonged tachysystole and profound bradycardia that a severe obstetric emergency was occurring and high on the differential diagnosis should have been uterine rupture.

In that setting, the Winn ACH health care providers should have been vigilant and responded immediately to the fetal bradycardia by initiating a single attempt at a rapid operative vaginal delivery and after delivery was not effected within 2 minutes, a cesarean delivery. Instead, with a severe bradycardia and a fetus at 0 station, an attempt was made for 21 minutes to achieve vaginal delivery that ultimately led to a prolonged hypoxic period and hypoxic ischemic injury to the fetus.

e. **Forceps and vacuum** - Using two different approaches to the operative vaginal delivery was a violation of the standard of care. In general, it is a violation of the standard of care to use both vacuum and forceps during a single delivery. However, in this setting, the additional time after failing with one or the other was a further violation of the standard of care. Additionally, the provider should not have attempted vacuum delivery when the baby was at a 0 or +1 station, as the baby was too high for this attempt. Dr. Kachroo compounded that error by using both forceps and vacuum. Following the forceps attempt, Dr. Kachroo again returned to

6

the vacuum at 20:27 which again resulted in a pop-off at 20:28. Again, a violation of the standard of care.

6.   Within a reasonable degree of medical certainty, I have also concluded that the above identified standard of care violations caused injury to Mrs. Charles-Wright and R.W.

The initial fetal heart tracing was reassuring in this case. There is no reason to think that there was any pre-existing injury to the fetus prior to the admission to labor and delivery. Thus, the injury, more likely than not, occurred during the labor and delivery admission.

In this case, the predominant cause of injury to the neonate and the mother was the uterine rupture. The uterine rupture was subsequent to a prolonged period (hours) of tachysystole that was due to the inappropriate management of oxytocin. Therefore, the violations of the standard of care executed by the clinicians caring for Mrs. Charles-Wright during her labor and delivery were numerous and included predominantly the management of labor (including both the first and second stages of labor). These violations of the standard led the uterine rupture which in turn, led to the injury to both Mrs. Charles-Wright and her child, R.W.

Additionally, even with the uterine rupture, there was a chance to prevent fetal injury by rapid delivery of the fetus. As noted above, had the clinicians assessed the fetus at the time of bradycardia, attempted an operative vaginal delivery for one contraction, and then moved to cesarean delivery, it is more likely than not that Mrs. Charles-Wright would have delivered rapidly and her neonate would not, more likely than not, have suffered an hypoxic-ischemic encephalopathy. Thus, had the standard of care been followed, R.W. would not have been injured.

Thus, it is my opinion in this case, that the departures from the standard of care led, more likely than not, to the hypoxic ischemic encephalopathy experienced by R.W. and, in turn, led to the longstanding neurologic injuries.

8.    I reserve the right to supplement my opinions in the event further information is provided to me.

9.    I make this Affidavit under oath, having been duly sworn, on the basis of my education, training and medical experience. I am of legal age and fully competent to testify to all of the opinions and conclusions stated herein. This Affidavit is executed for the purpose of being attached to and used in support of Plaintiffs' Original Complaint as required by O.C.G.A. §9-11-9.1.

_____
Aaron Caughey, MD, PhD

SUBSCRIBED AND SWORN to before me on this ___14th___ day of February, 2017.

_____
Notary Public, State of Oregon

My Commission Expires: _02/03/20_

OFFICIAL STAMP
SLADJANA STOJANOVIC
NOTARY PUBLIC-OREGON
COMMISSION NO. 946971
MY COMMISSION EXPIRES FEBRUARY 03, 2020

8